PRISCILLA R. OWEN, Circuit Judge:
Officer Martin Faul fatally shot Qua-maine Mason while responding to a reported armed robbery. Mr. Mason’s parents, Brenda and Billy Mason (together, the Masons), sued Faul asserting Fourth, Fifth, Eighth, and Fourteenth Amendment violations. The Masons also brought Monell[1] claims against Faul’s employer, Lafayette City-Parish Consolidated Government (Lafayette), and James Craft, Lafayette’s Chief of Police. The complaint also included claims against all three defendants under Louisiana state law. Faul raised the defense of qualified immunity. The district court granted the defendants’ motion for summary judgment and dismissed all of the Masons’ claims. Because there are material fact issues that preclude summary judgment in favor of Faul on the basis of qualified immunity, we reverse the summary judgment as to Faul on the Masons’ Fourth Amendment and state law claims and remand them to the district court. We otherwise affirm the district court’s judgment.
I
Because the district court disposed of the ease on summary judgment, we state the facts of the case in the light most favorable to the Masons, the nonmovants *272 below.[2] At the time of his death, Mr. Mason was dating Raequel Babino. Mr. Mason knew that Paul Pitkins, the father of Babino’s child, was coming to her apartment one evening regarding a phone bill. Mr. Mason did not know that Babino planned to prepare dinner for Pitkins and his cousin, Jeremy Richardson, to celebrate Pitkins’s recent college graduation.
Mr. Mason came to Babino’s apartment that evening to pick up his dog. He saw Babino through the apartment window and became upset, banging on the door and yelling. Babino asked her roommate to answer the door, and Babino locked herself in her bedroom with Pitkins and Richardson. Mr. Mason entered the apartment and attempted to pry open the bedroom door with a spoon.
Babino eventually opened the bedroom door. Mr. Mason entered the bedroom carrying a gun and ordered Pitkins and Richardson to leave. Mason threatened to “pistol whip” someone, but Babino states that the gun remained pointed at the ground at all times. Babino and Mr. Mason later exited the bedroom, and Mr. Mason eventually “got calm.” They discovered that Mr. Mason’s dog was missing and intended to leave the apartment to search for the dog.
In the meantime, Richardson had called 911. He told the operator that an armed individual had “broken into” Babino’s apartment to get a dog. He stated that he did not know the individual but that Babi-no and Pitkins knew him. Richardson described the suspect to the operator as a black male, approximately six feet tall and weighing 200 pounds, wearing black jeans and a black shirt.
Officer Martin Faul volunteered to respond to an incident described as an armed robbery that had been reported at Babino’s apartment. The Masons contend we must conclude that Faul approached the incident with no additional information because of his statements during his post-incident interview with the Louisiana State Police. The following exchange occurred between Faul and Frank Garcia, the State Police investigator:
[GARCIA]: You volunteered for the call, okay. Where were you when y’all got dispatched out there?
[FAUL]: I was en route to another armed robbery call around approximately Saint Christopher and Johnston.
[FAUL]: Yeah, I was going to Marshall’s Department Store.
[GARCIA]: When the call came over, when dispatch put the call out, were there any particulars, any notes or comments in the comment section on the call?
[FAUL]: Yes, I didn’t read them, but she verbally dispatched them.
[GARCIA]: Okay. What were the comments?
[FAUL]: Armed robbery, 200 Theater, Campus Crossing Apartments, Black male, black pants, black shirt with a gun still in the apartment, apartment 712.
[GARCIA]: Okay, alright. And is there any ’particular reason why you decided to go out here instead of going to Marshall’s?
[FAUL]: Yes, they had a canine handler already there.... I was going to keep rolling in case they you know they needed me. And then like I said when I got around Saint Christopher, the original, the first 64 [armed robbery] went to Charlie, so I put my base radio on Charlie and stopped it from scanning. And *273 then I still had one on me on Alpha. So, I was still listening to Alpha. And when I heard that call come in on Alpha, I was so close. On Alpha, I said, “Headquarters distract from that first 64, show me en route to that one.” You know, I don’t know if I said I was closer or whatever, but they said, “10-4.” And then ... the computer and [sic] did all this stuff, but I never paid no attention to the computer.
The Masons argue that the “never paid no attention to the computer” statement shows that Faul had no information about the situation he approached.
Faul arrived at the apartment complex and saw that Officers Brittney Dugas and Jace Galland were there. Faul removed his police canine from his car. The three officers encountered Richardson and Pit-kins, who directed them toward Babino’s apartment.
Mr. Mason and Babino opened the apartment door to find the officers with their guns drawn. Mr. Mason matched the description Faul alleges he received from dispatch. Babino moved in front of Mr. Mason. She positioned herself so that she shielded Mr. Mason from Officers Du-gas and Galland. She screamed to the officers, “What are you doing? He’s not doing nothing. What’s wrong?”
The. officers then issued commands to Mr. Mason and Babino, but the witnesses differ as to what commands were issued. According to Babino, the officers only ordered them to put their hands up. Faul asserts that Galland was the only officer to issue commands and that Galland told Mr. Mason and Babino to get on the ground. Dugas and Galland state that the officers issued conflicting orders for Mr. Mason and Babino to keep their hands up and get on the ground.
Although the officers contend that Mr. Mason reacted to the commands by squaring up with Faul and tucking his chin as if he were preparing to fight, Babino claims that Mr. Mason had his hands up and was not moving. Faul saw a gun in Mr. Mason’s waistband. Faul yelled “Gun!” and sent his dog towards Mr. Mason. Babino asserts that Mr. Mason only dropped his hands to his crotch after the dog had attacked him, in contrast to Faul, who claims that Mr. Mason’s right hand went to his side before he released the dog.
Faul asserts that once the dog had attacked Mr. Mason, Mr. Mason’s hand came in contact with his gun, so Faul began shooting. Babino asserts that Mr. Mason never did anything to require the officer to release the dog for an attack, that Mr. Mason never touched the gun, and that Mr. Mason never attempted to resist, assault or fire upon the police.
Faul’s initial shot struck Mr. Mason in the chin. The second shot struck Mr. Mason in the right shoulder, moving slightly from the back to the front. The third shot struck the upper back part of Mr. Mason’s right arm, fracturing his humerus. Dr. James Traylor, a forensic pathologist for the defense, stated that while the fracture would have severely restricted the movement of Mr. Mason’s right arm, he would have been able to flex some at the elbow, though not very effectively, but that moving his arm “would have been extremely painful.” Additionally, Dr. Traylor testified that Mr. Mason could still have moved his shoulder but also not very well. The fourth shot struck Mr. Mason in his lateral right chest wall, fracturing a rib. The fifth shot struck Mr. Mason on the upper back portion of the left arm, fracturing the left humerus. Dr. Traylor testified that at the time the fifth shot was fired, Mr. Mason was in a prone position, face down. Faul then temporarily stopped firing.
*274 Faul claims that Mr. Mason then moved his shoulder and elbow as if he were about to spin over, pull out the gun, and start shooting. Officer Dugas asserts that Mr. Mason was “still trying to reach for [the gun]” after the first five shots were fired. Babino, in contrast, states that once Mr. Mason was on the ground she only saw him “pick up his head and put it back down” and that she never saw Mr. Mason “move his body, the trunk of his body.” Faul fired two shots into Mr. Mason’s back, and Mr. Mason stopped moving. Babino states that after the shooting ended, Mr. Mason’s arms were not above his head but at his side.
Faul radioed for an ambulance and put the dog into a police vehicle. When Faul returned, Mr. Mason had been moved to a nearby breezeway, and Faul saw other officers were administering first aid to Mr. Mason. A civilian combat medic also helped care for Mr. Mason, but he died at the scene.
The Masons allege several irregularities in Lafayette’s investigation of the shooting. First, police later recovered an eighth bullet lodged in a wall that did not strike Mr. Mason. Murphy Riggs, a relative of Mr. Mason, testified that when he arrived at the scene, a bullet hole in a structure had been patched, and the area had been cleaned with bleach. Second, before Frank Garcia, the State Police investigator, arrived at the scene, Mr. Mason’s gun had been moved, and the magazine had been removed. Finally, after Faul’s interview with Garcia formally ended, the Masons allege that the video camera captured the following exchange:
Faul: Where was the gun when it was all said and done and who took it out? And where was it at?
Garcia: [Lafayette Police Officer] Bart [Ryder] took it.
Faul: Was it in his hand?
Garcia: Best as I can figure.
The Masons, individually and on behalf of their son, Mr. Mason, sued Faul, Chief Craft,, and Lafayette. They brought claims under 42 U.S.C. § 1983 alleging Faul (1) used excessive force in violation of the Fourth and Fourteenth Amendments; (2) deprived Mr. Mason of substantive due process under the Fourteenth Amendment by engaging in actions that “shock the conscience;” (3) and violated Mr. Mason’s Eighth Amendment and due process rights by acting with deliberate indifference to his medical needs after the shooting. The Masons brought Monell[3] claims against Lafayette and Craft. The complaint also included state law claims against the three defendants. Faul pled qualified immunity. The district court granted the defendants’ motion for summary judgment and dismissed all claims. The Masons appeal.
II
We review the district court’s grant of summary judgment de novo, applying the same standards as the district court.[4] Summary judgment is appropriate when “the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.”[5]
When reviewing a motion for summary judgment, we must “must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.”[6] No genuine issue of disput *275 ed fact exists “unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.”[7]
III
A plaintiff suing under § 1983 must “(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.”[8] A § 1983 suit may be brought against a person in his or her individual or official capacity as well as against governmental entities.[9]
In an individual-capacity suit, a defendant may raise the defense of qualified immunity.[10] “[Qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.”[11] We analyze a defendant’s assertion of qualified immunity under a two-prong test.[12] The first asks whether the plaintiff has shown sufficient facts to “make out a violation of a constitutional right.”[13] The second prong requires the court to determine “whether the right at issue was ‘clearly established’ at the time of defendant’s alleged misconduct.”[14]
IV
We begin with the Masons’ Fourth Amendment claim against Officer Faul. When a police officer uses force to make a “seizure,” we analyze a claim against the officer under the Fourth Amendment for “objective reasonableness.” [15] To prevail on an excessive-force claim, a plaintiff must show “(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable.”[16]
In Tennessee v. Gamer, the Supreme Court explained that to reasonably use deadly force, an officer must, at the very least, have “probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.”[17] The officer’s reasonableness in using force&emdash;deadly or non-deadly&emdash;is analyzed under an objective standard “in light of the facts and circumstances confronting [the officer], without regard to [his or her] underlying intent or motivation.”[18] In *276 Graham v. Connor, the Supreme Court directed courts determining an officer’s objective reasonableness to pay “careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.”[19] We consider reasonableness “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.”[20] Additionally, we must make “allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.”[21] Our inquiry is limited to whether the officer “was in danger at the moment of the threat” that resulted in the use of force.[22]
The district court did not correctly analyze the summary judgment record. The district court appears to have relied entirely on the officers’ account of events. For example, the district court accepts as “uncontroverted” Faul’s position that Mr. Mason’s hand went toward the gun in his waistband before Faul released the canine. Babino’s account of the shooting, which conflicts with the officers’ accounts in several key respects, is absent from the district court’s opinion despite having been discussed in the Masons’ briefing. Babi-no’s deposition contains an account of the shooting, and the facts she related are material to the' Fourth Amendment question.
When addressing excessive-force claims, courts have an obligation to “slosh our way through the factbound morass of ‘reasonableness.’ ”[23] Additionally, the Supreme Court has recently emphasized that in an excessive-force case on summary judgment, like any other case, a court must accept as true the evidence of the nonmoving party and draw all justifiable inferences in that party’s favor.[24] The district court failed to give credence to, or even make note of, Babino’s conflicting account of the shooting, which perhaps constitutes the Masons’ strongest evidence. We must give full credence to Babino’s testimony.[25]
As an initial matter, the Masons do not argue that Faul’s use of the canine, by itself, violated the Fourth Amendment. Rather, they argué that a Fourth Amendment violation arose through Faul’s use of his firearm and assert that the use of the canine against Mr. Mason while the shots were being fired is relevant to the question of Faul’s reasonableness. Accordingly, we do not address the constitutional standards for use of a police canine.
*277 We have explained that “an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased.”[26] Although the record reflects that there was a break between the first five and last two shots that struck Mr. Mason, and that Mr. Mason lay on the ground when the final two shots were fired, the district court did not expressly address whether Faul’s use of his firearm was justified throughout the encounter. We conclude that genuine issues of material fact arise regarding the final two shots that struck Mr. Mason, which requires reversal of the summary judgment in part, and we do not express an opinion as to whether Faul was entitled to qualified immunity for each of the first five shots.
A reasonable jury could conclude that a reasonable officer in Faul’s position would not have “probable cause to believe that [Mr. Mason] pose[d] a threat of serious physical harm”[27] at the time the final two shots were fired. Although Faul and Gal-land indicated that Mr. Mason moved in a threatening manner after he was on the ground, Babino’s testimony contradicts this portion of the officers’ accounts. Ba-bino indicated that she was able to see Faul fire all seven shots that struck Mr. Mason. She further explained that once Mr. Mason was on the ground, she saw “him pick up his head and put it back down” but did not see Mr. Mason “move his body, the trunk of his body.”
Other evidence in the record, viewed in the light most favorable to the Masons, corroborates Babino’s testimony. Although Dr. Traylor, the defense expert, indicated that Mr. Mason might be able to make a slight movement with his right elbow, he also explained that it “would have been, extremely painful” for Mr. Mason to use his right arm. Although Dr. Traylor’s testimony can support favorable inferences for both parties about whether Mr. Mason moved his arm, at the summary judgment stage, we must conclude that Mr. Mason’s arm was immobile while he lay on the ground.
In light of Babino’s and Dr. Traylor’s testimony, a reasonable jury could conclude that Mr. Mason lay incapacitated on the ground and did not move in a threatening manner before Faul fired the final two shots.[28] Accordingly, a reasonable jury could conclude that Mr. Mason objectively posed no immediate threat, such that Faul violated the Fourth Amendment by firing the final two shots.
We therefore must determine whether Faul is entitled to qualified immunity on the grounds that he did not violate clearly established law. The law is clearly established if there is factually similar, controlling case law from this court or the Supreme Court.[29] The present case is an *278 “obvious one where Graham, and Gamer alone offer a basis for decision.”[30] The constitutionality of the final two shots can be decided on the threshold issue&emdash;under Gamer&emdash;of whether deadly force was permissible, i.e., whether Mr. Mason objectively posed an immediate threat.[31] The second, more complex inquiry dictated by Graham&emdash;balancing the severity of the threat against other factors[32]&emdash;is not necessary here. A reasonable jury could conclude that when Faul fired the final two shots, Mr. Mason would have appeared incapacitated to an objectively reasonable officer. Shooting a clearly incapacitated suspect is inconsistent with Gamer’s command that deadly force is unconstitutional when a “suspect poses no immediate threat to the officer and no threat to others.”[33] We therefore conclude that there are material fact questions as to whether Faul is entitled to qualified immunity for firing the final two shots. The district court erred in granting Faul’s motion for summary judgment on the Fourth Amendment and state law claims.
V
The Masons argue that Faul violated Mr. Mason’s substantive due process rights under the Fourteenth Amendment because his actions “shocked the conscience.” [34] In Graham, the Supreme Court held:
[A]ll claims that law enforcement officers have used excessive force&emdash;deadly or not&emdash;in the course of an arrest, investigatory stop, or other “seizure” of a free citizen should be analyzed under the Fourth Amendment and its “reasonableness” standard, rather than under a “substantive due process” approach.[35]
While substantive due process applies to some police conduct, the Supreme Court has refused to look beyond the Fourth Amendment when the police “seize” a suspect.[36] A seizure occurs “only when there is a governmental termination of freedom of movement through means intentionally applied.”[37]
Faul “seized” Mr. Mason when he terminated Mr. Mason’s freedom of movement using the canine and his gun.[38] The Masons substantive due process claim fails as a matter of law.
VI
The Masons argue that Faul violated the Eighth and Fourteenth Amendments by *279 acting with deliberate indifference by failing to render aid to Mr. Mason after the shooting. The Eighth Amendment does not apply in the present case because no adjudication of Mr. Mason’s guilt occurred.[39] Therefore, we turn to the Masons’ claim under the Fourteenth Amendment’s Due Process Clause.
“The Due Process Clause ... requirefs] the responsible government or governmental agency to provide medical .care to persons ... who .have been injured while being apprehended by the police.” [40] “[T]he plaintiff must show that an officer acted with subjective knowledge of a substantial risk of serious medical harm, followed by a response of deliberate indifference.” [41] Deliberate indifference is “an extremely high standard to meet.”[42] A plaintiff “must show that the officials ‘refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.’ ”[43]
The Masons’ deliberate indifference argument is narrow. The Masons allege that Lafayette’s police policy requires an officer to “immediately ... determine the physical conditions of any injured person and render first aid.” They note that after the shooting, Faul called an ambulance, left to put the dog into the police vehicle, and returned to render first aid but found others addressing Mr. Mason’s wounds; they find fault with the fact that Faul did not personally participate in Mr. Mason’s care. They also seek to hold Faul liable for the inadequate care by others because Mr. Mason was dragged by his legs from the scene of the shooting to a nearby breezeway.
Faul’s conduct did not rise to the level of deliberate indifference. A failure to follow official policy, by itself shows, at most, negligence and cannot support a finding of deliberate indifference.[44] Faul’s decision to place the dog, which had been attacking Mr. Mason, in the police car, and to defer to other officers to attend to Mr. Mason, cannot fairly be described as showing “a wanton disregard for [Mr. Mason’s] serious medical needs.”[45] Additionally, when addressing deliberate indifference, we must evaluate an official’s conduct individually rather than collectively so long as multiple officials are not acting in unison.[46] The other officers’ decision to drag Mr. Mason, if deliberate indifference, cannot give rise to liability for Faul. Faul is entitled to judgment as a matter of law on the deliberate indifference claims.
VII
The Masons also bring claims against Lafayette and Chief Craft, in his official capacity. Because Craft was sued in his official capacity, the claim against him is *280 treated as a claim against Lafayette, a municipality.[47]
In Monell v. Department of Social Services,[48] the Supreme Court held that a municipality cannot be held liable under § 1983 solely because its employee committed a constitutional tort.[49] In other words, a plaintiff cannot prevail on a theory of respondeat superior.[50] Accordingly, to hold a municipality liable under § 1988, the plaintiff must prove three elements: (1) a policymaker; (2) an official policy; and (3) a “violation of constitutional rights whose ‘moving force’ is the policy or custom.” [51]
We have defined “official policy” to mean:
1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality’s lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.[52]
“Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy.”[53]
The “moving force” inquiry requires a plaintiff to make two showings: causation and culpability.[54] A plaintiff must show a “direct causal connection ... between the policy and the alleged constitutional deprivation.”[55] The “moving force” inquiry imposes a causation standard higher than “but for” causation.[56] Under the culpability requirement, if the policy is facially lawful, a plaintiff must also show that the municipality “promulgated [the policy] with deliberate indifference to the ‘known or obvious consequences’ that constitutional violations would result.”[57] Even' a showing of heightened negligence is insufficient to show the deliberate indifference needed to prove municipal liability.[58]
The Masons point to numerous acts that they claim evince a policy or custom. First, the Masons argue that the three officers approached Mr. Mason without sufficient information. They allege that the three officers “agree that they do not listen to the computer routinely” and *281 provide expert testimony establishing that officers need the information they receive from dispatch. However, the record does not support the Masons’ assertion. In his statement to Garcia, the State Police investigator, Faul said that he did not read the notes on the screen in his vehicle about the armed robbery reported at Babino’s apartment; rather, he listened to the dispatcher read the comments to him, describing the suspect and the location. Faul’s statement also says that after he told the dispatcher that he was going to the armed robbery at Babino’s apartment rather than the one at Marshall’s, Faul stated that “the computer and [sic] did all this stuff, but I never paid no attention to the computer.” On summary judgment, we must make “justifiable” inferences in the nonmovant’s favor.[59] Because Faul plainly stated that he received the information from dispatch verbally rather than reading the written notes on a call, no reasonable jury could infer that Faul’s later statement that he “never paid no attention to the computer” — read in context — : meant that he was not aware of the information describing the suspect that was communicated verbally. Alternatively, assuming the officers ignored dispatch and that ignorance reached the level of custom, the Masons have not met their burden on causation. They have not pointed to’ any information that dispatch provided on the computer that, if known by Faul, would have altered the course of events.
Second, the Masons focus on Faul’s use of the police dog. They note that Faul admitted to not knowing of Lafayette’s policies on the use of canines and that he admitted that it is unusual to use a dog when firing a weapon. They also contend that his conduct showed an inability to retain his training about using a police dog. This evidence does not identify a municipal policy or custom. To the contrary, it shows, at most, that Faul failed to follow policy.
Third, the Masons note that the three officers failed to maintain cover when approaching Mr. Mason; their experts allege that this is “evidence of a systemic practice.” However, the Masons have not produced any evidence that the officers’ failure to maintain cover was more than an “isolated violation.”[60] Therefore, they have not met their burden of showing a custom or policy.
Similarly, the Masons seek to impose Monell liability by alleging several other errors by the officers. They point to the officers’ failure to negotiate and conflicting commands to Mr. Mason and Babino as well as Faul’s decision to shoot Mr. Mason when he was already on the ground. But, again, the Masons provide no proof that these practices rise to the level of custom or policy.
Finally, the Masons point to defects in Lafayette’s investigatory and disciplinary proceedings. They allege that Lafayette police cleaned the crime scene and manipulated Mr. Mason’s gun. They also fault Lafayette for keeping Faul on the job because he discussed the incident with the state-police investigator after his official interview terminated. We have held that “it is nearly impossible to impute lax disciplinary policy to [a municipality] without showing a pattern of abuses that transcends the error made in a single case.”[61] Here, the Masons have not provided evidence of problems with *282 Lafayette’s disciplinary and investigatory procedures outside the present case. Accordingly, Lafayette and Chief Craft cannot be held liable under Monell.
VIII
The Masons also bring claims under Louisiana state law. The parties agree that the Fourth Amendment’s reasonableness standard applies to the state-law claims, such that the state-law claims rise or fall with the Fourth Amendment claim. For this proposition, the parties and the district court have cited to our unpublished opinion in Winston v. City of Shreveport[62] but have not pointed to any published cases that directly establish this proposition[63] from our court or the Louisiana Supreme Court.[64]
Because the parties are in agreement but have not thoroughly briefed the issue, we assume, without deciding, that Louisiana law employs the same reasonableness standard as the Fourth Amendment. Therefore, we reverse the district court’s grant of summary judgment on the Masons’ claims against Faul under Louisiana state law and remand.
For the foregoing reasons, we AFFIRM the district court’s judgment with regard to the Masons’ substantive due process and deliberate indifference claims; we REVERSE the district court’s judgment that Officer Faul is entitled to qualified immunity with respect to the Fourth Amendment and state law claims, as to the final two shots; and REMAND for consideration in the first instance whether Officer Faul’s other actions are entitled to qualified immunity in the'light of Babino’s testimony.

. Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

. See Newman v. Guedry, 703 F.3d 757, 761 (5th Cir.2012).

. Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

. Newman, 703 F.3d at 761.

. Fed.R.Civ.P. 56(a).

. Newman, 703 F.3d at 761 (quoting Deville v. Marcantel, 567 F.3d 156, 164 (5th Cir.2009) (per curiam)).

. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

. Moore v. Willis Indep. Sch. Dist., 233 F.3d 871, 874 (5th Cir.2000) (citing Leffall v. Dall. Indep. Sch. Dist., 28 F.3d 521, 525 (5th Cir.1994)).

. Goodman v. Harris Cnty., 571 F.3d 388, 395 (5th Cir.2009).

. Id.

. Id. (quoting Wallace v. Cnty. of Comal, 400 F.3d 284, 289 (5th Cir.2005)).

. Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

. Id. at 232, 129 S.Ct. 808.

. Id.

. Graham v. Connor, 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

. Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir.2011) (quoting Hill v. Carroll Cnty., Miss., 587 F.3d 230, 234 (5th Cir.2009)).

. 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (providing this standard when an officer faces a fleeing suspect); see also Ramirez v. Knoulton, 542 F.3d 124, 129 (5th Cir.2008) (applying the same standard to a non-fleeing suspect).

. Graham, 490 U.S. at 397, 109 S.Ct. 1865.

. Id. at 396, 109 S.Ct. 1865.

. Id.

. Id. at 396-97, 109 S.Ct. 1865.

. Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir.2011) (quoting Bazan ex rel. Bazan v. Hidalgo Cnty., 246 F.3d 481, 493 (5th Cir.2001)) (emphasis omitted).

. Scott v. Harris, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

. Tolan v. Cotton, - U.S. -, 134 S.Ct. 1861, 1863, 188 L.Ed.2d 895 (2014) (per curiam) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

. See, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[T]he court ' ... may not make credibility determinations.” (citing Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990))).

. Lytle v. Bexar Cnty., 560 F.3d 404, 413 (5th Cir.2009).

. Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (providing this standard when an offic'er faces a fleeing suspect); see also Ramirez v. Knoulton, 542 F.3d 124, 129 (5th Cir.2008) (applying the same standard to a non-fleeing suspect).

. See Plumhoff v. Rickard, — U.S.-, 134 S.Ct. 2012, 2022; 188 L.Ed.2d 1056 (2014) (suggesting, in dicta, that a Fourth Amendment violation might occur if the defendant officers "had initiated a second round of shots after an initial round had clearly incapacitated” the decedent); see also Bush v. Strain, 513 F.3d 492, 502 (5th Cir.2008) (holding that an officer cannot use further non-deadly force against a "restrained and subdued” suspect). *278 Cir.2002) (en banc) (“[I]n the absence of directly controlling authority, a consensus of cases of persuasive authority might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were, lawful.”).

. Brosseau v. Haugen, 543 U.S. 194, 199, 125 S.Ct 596, 160 L.Ed.2d 583 (2004).

. See, e.g., Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

. Graham v. Connor, 490 U.S. 386, 396, 109 . S.Ct. 1865, 104 L.Ed.2d 443 (1989); see also Ramirez v. Knoulton, 542 F.3d 124, 129 (5th Cir.2008).

. 471 U.S. at 11, 105 S.Ct. 1694.

. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

. Graham, 490 U.S. at 395, 109 S.Ct. 1865.

. See Lewis, 523 U.S. at 843-45, 118 S.Ct. 1708.

. Brower v. Cnty. of Inyo, 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989).

. See Petta v. Rivera, 143 F.3d 895, 913-14 (5th Cir.1998) (noting that the fact that the officer’s bullet did not strike the plaintiff prevented the case from being a seizure case analyzed under the Fourth Amendment).

.See Reichle v. Howards,-U.S.-, 132 S.Ct. 2088, 2094, 182 L.Ed.2d 985 (2012) (assuming arguendo that controlling circuit court precedent could "be a dispositive source of clearly established law in the circumstances of this case”); cf. McClendon v. City of Columbia, 305 F.3d 314, 329 (5th

. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

. Id.

. Hill v. Carroll Cnty., 587 F.3d 230, 238 (5th Cir.2009).

. United States v. Gonzales, 436 F.3d 560, 574-75 (5th Cir.2006) (citing Domino v. Tex. Dep’t of Criminal Justice, 239 F.3d 752, 755 (5th Cir.2001)).

. Domino, 239 F.3d at 756 (quoting Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir.1985)).

. See Jacobs v. W. Feliciana Sheriffs Dep’t, 228 F.3d 388, 398 (5th Cir.2000).

. Domino, 239 F.3d at 756.

. Jacobs, 228 F.3d at 395.

. See Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) (“Suits against state officials in their official capacity therefore should be treated as suits against the State.'').

. 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

. Id. at 691, 98 S.Ct. 2018.

. Id.

. Piotrowski v. City of Hous., 237 F.3d 567, 578 (5th Cir.2001) (quoting Monell, 436 U.S. at 694, 98 S.Ct. 2018).

. Webster v. City of Hous., 735 F.2d 838, 841 (5th Cir.1984) (en banc) (per curiam).

. Bennett v. City of Slidell, 728 F.2d 762, 768 n. 3 (5th Cir.1984) (en banc).

. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

. Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir.1992).

. Id.

. Piotrowski v. City of Hous., 237 F.3d 567, 579 (quoting Brown, 520 U.S. at 407, 117 S.Ct. 1382).

. Id. (quoting Brown, 520 U.S. at 407, 117 S.Ct. 1382).

.Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

. Bennett v. City of Slidell, 728 F.2d 762, 768 n. 3 (5th Cir.1984).

. Piotrowski, 237 F.3d at 582.

. 390 Fed.Appx. 379, 385-86 (5th Cir.2010) (per curiam) (citing Reneau v. City of New Orleans, No. Civ.A. 03-1410, 2004 WL 1497711, at *4 (E.D.La. July 2, 2004)).

. See Howe ex rel. Howe v. Scottsdale Ins. Co., 204 F.3d 624, 627 (5th Cir.2000) ("If the Louisiana Supreme Court has not ruled on this issue, then this Court must make an 'Erie guess’ and 'determine as best it can’ what the Louisiana Supreme Court would decide.” (quoting Krieser v. Hobbs, 166 F.3d 736, 738 (5th Cir.1999))); see also 19 Wright, Miller, & Cooper, Federal Practice and Procedure § 4520 (explaining that the Erie doctrine applies even when the basis of jurisdiction is not diversity).

. Compare Kyle v. City of New Orleans, 353 So.2d 969, 973 (La.1977) ("Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case. A court must evaluate the officers' actions against those of ordinary, prudent, and reasonable men placed in the same position as the officers and with the same knowledge as the officers.”), with Mathieu v. Imperial Toy Corp., 646 So.2d 318, 323 (La.1994) ("The reasonableness test we employed in Kyle is based upon the text of the Fourth Amendment to the United States Constitution, as well as La.Code Cr.P. art. 220." (second emphasis added) (footnote omitted)).