# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 30, 2008

Charles R. Fulbruge III
Clerk

No. 07-50547

RICHARD WAYNE GRAVES,

Plaintiff-Appellee,

v.

DEPUTY DON ZACHARY,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Texas
No. 1:06-CV-577

Before SMITH and PRADO, Circuit Judges, and YEAKEL, District Judge.[*]

JERRY E. SMITH, Circuit Judge:[**]

Deputy Sheriff Don Zachary shot Richard Graves, a criminal suspect, twice. Graves sued Zachary for using excessive force. Zachary unsuccessfully moved for summary judgment, claiming qualified immunity. Zachary filed this

---

[*] District Judge of the Western District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

interlocutory appeal. Because there are genuine issues of material fact, we dismiss the appeal for want of appellate jurisdiction.

I.

A little after three o'clock one morning in 2004, Graves phoned his ex-girlfriend, Tania Besek, and told her he was coming to her second-floor apartment. Earlier, Besek had attended a party, possibly with her new boyfriend; Graves phoned repeatedly about that party. Approximately fifteen minutes later, Graves arrived. Besek reported that she opened her door slightly and found that Graves smelled of alcohol and had a gun and a box of bullets.

Graves wanted Besek to take him to see her boyfriend. Graves put the gun to his head, threatened to shoot himself, put the gun in Besek's face, and threatened to shoot her in the leg. Besek locked the door and called 911, saying that Graves was threatening to shoot himself with what looked "like a small machine gun" and was banging on her door. She told the 911 dispatcher that the police are "going to have to do it a certain way, because he's got a gun, okay."

Zachary soon arrived with other officers (Deputies Ryan Lloyd, Robert Newell, and Kenneth Wilson). Zachary unholstered his weapon and approached the stairs leading to the apartment, with Lloyd and Newell behind him. Wilson was farther away.

As he was climbing the set of stairs, Zachary saw Graves kneeling in front of the door. Calling "Sheriff's Department" and displaying his badge, Zachary either ordered Graves to "raise his hands"SSwhat Zachary reported sayingSSor "let me see your hands"SSwhat Graves remembered hearing. Graves showed his hands while pressing the gun against his own temple.[1] Graves says he then told Zachary that he "just want[ed] to die." In his voluntary statement after the

---

[1] Lloyd, contrary to all other accounts, recorded that Graves "waived [the gun] around up in the air [and] then put the barrel to his head."

shooting, Zachary did not report hearing anything, but Newell reported that he heard Graves say "something" to Zachary.

What happened next is uncertain. In his statement, Zachary said that he told Graves two or three times to lower the gun. In his pleadings in the district court, Graves denied hearing that order. Neither Besek nor Lloyd reported, in their voluntary statements, that they heard it, and Newell, in his statement, said that all the officers were "screaming at the guy [and that Newell] screamed 'Sheriff's Office. Drop the weapon,' numerous times," but Newell did not record that Zachary also ordered Graves to lower the gun. WilsonSSwho was farthest awaySSreported that he heard Zachary's order. Graves did not lower the gun.

Zachary, in his statement, reported that he realized Graves might turn the weapon on him. Allegedly fearing for his life and Besek's, Zachary contends in his brief that he "instinctively" shot Graves.

The first shot hit Graves in the groin; the impact of that shot on Graves is disputed. Zachary, corroborated by Lloyd, said that Graves did not "slump down" or drop his weapon after the first shot. Graves, however, though acknowledging that he still was holding his gun, says that after the first shot he "was downed or incapacitated." After a short delaySSwhich is reflected in the 911 transcript of the incident[2]SSZachary shot him again, this time in the chest. Zachary then picked up Graves's gun.

It is not disputed that Graves never verbally threatened Zachary or the other officers, never pointed his gun at the officers, and did not even move aggressively. Instead, Graves was sitting still with his eyes closed, his hands up, and the gun to his head when Zachary started firing.

In the ambulance, when asked why the police shot him, Graves answered that it was "because I wanted them to," and he did "whatever I had to" to get

---

[2] A 911 transcript exists because Besek was still on the phone with the dispatcher when Zachary shot Graves.

them to shoot. When asked if this was a "suicide by cop," Graves responded "yeah." He made similar comments in the emergency room.

Graves pleaded guilty of aggravated assault with a deadly weapon. Pursuant to 42 U.S.C. § 1983, he then sued Zachary for using excessive force.

## II.

"This court reviews de novo the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity." Freeman v. Gore, 483 F.3d 404, 410 (5th Cir. 2007). There has not been a final judgment here, thus limiting our jurisdiction to address Zachary's interlocutory appeal. "A defendant in a section 1983 action can immediately appeal a district court's denial of a motion for summary judgment based on qualified immunity under the collateral order doctrine to the extent that the appeal turns on a question of law." Id. But "[w]here the district court has denied summary judgment on the ground that material issues of fact exist as to the plaintiff's claims, this court lacks jurisdiction to review the court's determination that a genuine fact issue exists." Id.

Nonetheless, we "review whether any factual dispute found by the district court is material for summary judgment purposes; that is, [we] can consider the legal sufficiency of the facts that the district court found to be supported by the summary judgment record." Id. "Thus, a defendant challenging the denial of a motion for summary judgment on the basis of qualified immunity must be prepared to concede the best view of the facts . . . and discuss only the legal issues raised by the appeal." Id. (internal citations and quotations omitted).

We "appl[y] a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights,"

and, "[i]f so, we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." Id. at 410-11 (internal citations omitted). We "appl[y] an objective standard based on the viewpoint of a reasonable official in light of the information then available . . . and the law that was clearly established at the time . . . ." Id. at 411.

Relative to the first inquiry, "the use of excessive force to apprehend a subject implicates the Fourth Amendment's guarantee against unreasonable seizures." Colston v. Barnhart, 130 F.3d 96, 99 (5th Cir. 1997). "To prevail on an excessive force claim, a plaintiff must establish: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Freeman, 483 F.3d at 416 (internal citations and quotations omitted). "[T]he question [is] whether the totality of the circumstances justified" that use of force. Tennessee v. Garner, 471 U.S. 1, 8-9 (1985).

The test is objective, Fontenot v. Cormier, 56 F.3d 669, 675 (5th Cir. 1995), but it "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Graham v. Connor, 490 U.S. 386, 396 (1989). After all, "police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation." Id. at 397. "The intent or motivation of the officer is irrelevant; the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliot v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Graham, 490 U.S. at 396-97).

The "[u]se of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." Mace v. City of Palestine, 333 F.3d 621, 624 (5th Cir. 2003). On the

other hand, "[i]t is objectively unreasonable to use deadly force unless it is necessary to prevent [a suspect's] escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." Flores v. City of Palacios, 381 F.3d 391, 399 (5th Cir. 2004) (internal citations and quotations omitted). Thus, "[t]o gauge the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for force," paying "careful attention to the facts and circumstances of each particular case." Id. (internal citations and quotations omitted).[3]

After determining whether the Constitution was violated, we assess whether the right was clearly established. It must be "clearly established in a . . . particularized . . . sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," Brosseau v. Haugen, 543 U.S. 194, 198-99 (2004) (internal citations and quotations omitted), and the conduct at issue must not fall "in the hazy border between excessive and acceptable force," id. at 201 (internal citations and quotations omitted).[4] "Of course, in an obvious case, [general] standards can 'clearly

---

[3] Though "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (internal citations and quotations omitted).

[4] Caselaw from this circuit (and, of course, from the Supreme Court) is the best way to determine whether a right was clearly established. See McClendon v. City of Columbia, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) ("[I]n the absence of directly controlling authority, a consensus of cases of persuasive authority might, under some circumstances, be sufficient to compel the conclusion that no reasonable officer could have believed that his or her actions were lawful.") (internal citations and quotations omitted). Caselaw need not be directly on point, though it should be close, and if the conduct is particularly outrageous, the caselaw putting the officer on notice can be more general in character. See Pierce v. Smith, 117 F.3d 866, 882 (5th Cir. 1997) ("We recognize that in order to preclude qualified immunity it is not necessary that the very action in question has previously been held unlawful, or that the plaintiff (continued...)

establish' the answer, even without a body of relevant case law." Id. at 199.

It is not disputed that Graves was injured by the use of deadly force. The question is whether that force was unnecessary and, if so, whether Zachary should have been on notice that his conduct violated the Fourth Amendment.

### III.

There are factual disputes as to whether Graves was incapacitated by the first shot such that the second shot was unnecessary and whether Zachary told Graves to drop the gun. As to the first, Graves claims that after the first bullet he "was downed or incapacitated" but that, after waiting at least long enough for the 911 dispatcher to mention hearing the shot, Zachary fired again. Zachary, however, says that Graves did not "slump down" until after the second shot. This factual dispute is material. If Graves obviously was "down[]," then Zachary would not have had a "reason to believe that the suspect pose[d] a threat of serious harm to the officer or others." Mace, 333 F.3d at 624.[5]

Zachary tries to cloud this straightforward issue of material fact by pointing out that Graves still had his gun, going so far as to say "[a]s long as Graves possessed the gun, Zachary had probable cause to believe that Graves posed a threat to Zachary and others." This is unsatisfactory. Though police have good reason to be wary of a suspect who has just been shot, this argument cuts far too broadly. Merely having a gun in one's hand does not mean per se that one is dangerous.

---

[4] (...continued)
point to a previous case that differs only trivially from his case. However, the facts of the previous case do need to be materially similar. We also recognize that the egregiousness and outrageousness of certain conduct may suffice to obviously locate it within the area proscribed by a more general constitutional rule . . . .") (internal citations and quotations omitted).

[5] Cf. Dickerson v. McClellan, 101 F.3d 1151, 1163 (6th Cir. 1996) (finding genuine issue of material fact where there were questions "regarding the sequence of events immediately preceding the shooting").

The question is this:  Viewing the facts objectively, after being shot, did Graves appear to be in any condition to fire his weapon?  Zachary says yes, but Graves says no.  Reading the facts in the light most favorable to Graves, there is a genuine material issue whether Zachary violated Graves's constitutional rights by shooting him after he was already "incapacitated."[6]

There is also a factual dispute as to whether Zachary told Graves to put the gun down before shooting him.  Zachary says he gave the order, but Graves claims there was only generalized yelling, not a specific command.  Graves's account is supported by Besek, who reported hearing only yelling.  Lloyd also did not record hearing that statement, reporting only that he heard Zachary's instruction for Graves to raise his hands.

Newell reported that he—farther away from Graves than was Zachary— ordered Graves to drop the gun, but his statement does not mention Zachary, the officer directly engaged with Graves, as also giving such an order.  The only officer who reported hearing Zachary tell Graves to drop the gun was Wilson, who— it is uncontested—was farthest away.  The evidence, thus, when viewed in the light most favorable to Graves, indicates that he was complying with Zachary's instructions when Zachary shot him.[7]

---

[6] Though we are mindful of the danger of armchair quarterbacking law enforcement, there are too many unanswered questions here.  For instance, after Graves was shot, did it appear to Zachary that Graves was still able to fire his gun, and which way was Graves's gun pointing?  The record is silent on these issues.  Moreover, what did Graves do immediately after being shot?  Did he yell or convulse?  We do not know from the record.  Consequently, when the record is viewed in the light most favorable to Graves, we must assume that, objectively, he was no longer a threat, but Zachary fired again.

[7] Graves does not argue that Zachary did not order him to drop his gun, but only that Graves did not hear the specific command.  There is a strong argument that if an officer makes an order in a crisis situation, we ought not second-guess whether that order was given based on speculation that if it was not heard, it was not said.

Here, however, there is more.  The three people closest to Zachary and Graves—Besek, Lloyd, and Newell—failed to report that they heard Zachary order Graves to drop the gun.

(continued...)

8

The next question is whether Zachary's violation was objectively unreasonable in light of clearly established law. Accepting Graves's accountSSas we must SSthe violation of his constitutional rights would have been "obvious . . . even without a body of relevant case law." Brosseau, 543 U.S. at 199. Under general precedents such as Garner, Zachary should have known that his use of force was excessive. It does not take a specific case for an officer to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively "downed or incapacitated."[8]

Because there are genuine issues of material fact, we have no appellate jurisdiction, so the appeal is DISMISSED. We express no view on the ultimate merits of the claim.

---

[7] (...continued)
Lloyd's failure to hear that specific order, even though he was the closest officer to Zachary at the time, and even though he acknowledged hearing Zachary's other statement, is particularly important. When we view the facts in the light most favorable to Graves, there is a genuine issue as to whether Zachary actually ordered Graves to drop his weapon.

On appeal, Zachary argues that "Graves' argument that he was not given adequate or fair warning that he was about to be shot is ludicrous at best. It is doubtful that peace officers confronted with an armed suspect are going to be yelling for the New Orleans Saints to score a touchdown." If Zachary never ordered Graves to drop the gun, however, it was reasonable for Graves to continue to hold the gun until he was ordered to put it down.

[8] The district court found that whether Graves said "I just want to die" when Zachary arrived was also a genuine issue of material fact. Though we are skeptical as to the materiality of that fact issue, cf. Mace, 333 F.3d at 624-25, we need not reach the question.