# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————

No. 14-10228

————————

United States Court of Appeals
Fifth Circuit

**FILED**
September 25, 2018

Lyle W. Cayce
Clerk

RANDY COLE; KAREN COLE; RYAN COLE,

Plaintiffs-Appellees

v.

CARL CARSON,

Defendant-Appellant

* * * * * * * * * * * * * * *

————————

No. 15-10045

————————

RANDY COLE; KAREN COLE; RYAN COLE,

Plaintiffs-Appellees

v.

MICHAEL HUNTER; MARTIN CASSIDY,

Defendants-Appellants

————————————

Appeals from the United States District Court
for the Northern District of Texas

————————————

**ON REMAND FROM THE UNITED STATES SUPREME COURT**

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

No. 14-10228 c/w 15-10045

Qualified immunity is a judicially created doctrine calculated to protect an officer from trial before a jury of his or her peers. At bottom lies a perception that the jury brings a risk and cost that law-enforcement officers should not face, that judges are preferred for the task—a judgment made by appellate judges.

We return to the October 25, 2010 shooting of Ryan Cole, at the time a seventeen-year-old high-school student in Sachse, Texas. Cole's parents, Karen and Randy, individually and as next friends of their son (collectively "the Coles") brought suit against Officer Carl Carson, Lieutenant Martin Cassidy, and Officer Michael Hunter of the Sachse Police Department under 42 U.S.C. § 1983. The Coles allege that the officers violated Cole's Fourth and Fourteenth Amendment rights during the shooting incident and by a subsequent fabrication of evidence. The officers filed dispositive pretrial motions in the district court, asserting the defense of qualified immunity. The district court denied these motions. In an earlier opinion, we affirmed the district court's denial of the officers' motions, with the exception of its denial of Carson's motion to dismiss the Fourth Amendment claim arising from fabrication of evidence.[1] Our previous judgment has now been vacated by the Supreme Court,[2] and we consider the case on remand in light of the Court's decision in *Mullenix v. Luna*.[3] We affirm the denial of Cassidy and Hunter's motion for summary judgment, otherwise reinstate our previous opinion in this case, and remand for further proceedings consistent with this opinion.

---

[1] *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015), *vacated sub nom. Hunter v. Cole*, 137 S. Ct. 497 (2016).

[2] *Hunter v. Cole*, 137 S. Ct. 497 (2016).

[3] *Id.* (granting certiorari, vacating, and remanding for consideration in light of *Mullenix v. Luna*, 136 S. Ct. 205 (2015) (per curiam)).

No. 14-10228 c/w 15-10045

## I

On October 25, 2010, at around 10:30 a.m., the Sachse Police Department called available units to the neighboring town of Garland, Texas. Police there were searching for Ryan Cole, a seventeen-year-old white male, last seen around Norfolk Drive armed with up to three weapons, including a nine-millimeter handgun.

Officer Michael Hunter responded by proceeding immediately to Norfolk Drive. In a statement given the day of the incident, Hunter described there encountering a young man who explained that Cole had given one of his guns to him, and that he had unsuccessfully tried to persuade Cole to surrender a handgun. In testimony given almost four years later in connection with this litigation, Hunter could recall in further detail that the young man was Eric Reed Jr., and that Reed described an altercation with Cole, which culminated in Cole threatening Reed with harm. Beyond the physical description relayed over the police radio, Hunter otherwise learned nothing "that would cause [him] to believe Cole was violent or wanted to hurt anyone."[4] Hunter searched the area, but heard over the radio that the suspect had been located in a nearby alleyway. Hunter went to the location. There he saw two officers following Cole, who was walking away from the officers holding his gun to his head, approaching railroad tracks in a wooded area along Highway 78. Hunter testified to his understanding that Cole was suicidal, and four years after the incident he also raised the possibility for the first time that Cole was using suicide as a pretext to evade the police. Hunter also testified four years later that he had heard police-radio transmissions indicating that officers were protecting nearby schools because of "Cole's dangerous conduct which posed a

---

[4] In a 2014 declaration, Hunter stated that Cole refused a police officer's order to surrender his weapon. Hunter did not testify that he knew this fact at the time.

risk of serious harm to a great many innocent in the vicinity." Hunter suggested to Officer Carl Carson, who had joined him on the scene, that they circle behind the wooded area to intercept Cole.

Meanwhile, Lieutenant Martin Cassidy had also heard the original dispatcher's summons. Cassidy called the Sachse Police Department for more information. On the day of the incident, Cassidy testified that he learned from the conversation that "this subject had shown up at [a] residence with a handgun and had just recently been seen walking away." Four years later, Cassidy testified that he had also learned much more: Cole was distraught from a recent separation from his girlfriend, also a student at Sachse High School; Cole had been involved in a domestic disturbance the previous night, and had brought a number of firearms to a friend's house, retaining possession of at least one and as many as three firearms. Cassidy had also learned that Cole "had threatened to shoot anyone who tried to take his gun," and had refused an order to drop his weapon. Sachse High School was about two miles from the search area, and Cassidy became concerned about the possibility that Cole intended to target the school. Following the search from his car, Cassidy also decided to intercept Cole on Highway 78.

The three officers arrived at the side of Highway 78 around the same time. Hunter drew his duty weapon; Cassidy also drew his firearm, and advised Carson to be ready to use his taser. The officers started walking along the tree line. A steep embankment rose from the railroad tracks to the area along Highway 78. Cole would have to climb this embankment to approach the tree line. Cassidy and Hunter used both the edge of the embankment and the vegetation to conceal themselves as they walked. Hunter also removed his white motorcycle helmet in order to be less conspicuous. Cassidy soon heard a

message over the police radio: Cole was ascending to the tree line. Hunter heard movement in the brush, and signaled to his colleagues.

The Coles' narrative of the roughly five seconds that followed relies on medical reports, ballistics analysis, and evidence collected on the scene and retrieved from Cole's body.[5] Moments after Hunter signaled to his colleagues, Cole backed out of the brush. He was facing away from the officers, his right arm raised, holding the barrel of the handgun to his right temple. For three to five seconds the officers had an opportunity to yell out to Cole to freeze or drop his gun. But the officers perceived that Cole was unaware of their presence, and remained silent so as not to alert him.[6] Cole began to turn counterclockwise. Around this time either Carson or Cassidy began to issue a command to Cole.[7] Before the officer could warn Cole, however, Hunter fired, followed by Cassidy. Still holding the handgun to his temple, Cole pulled the trigger, firing into his head.

The officers offer alternative accounts. They agree with each other that moments after Hunter signaled to Carson and Cassidy, Cole backed out from the brush about 10 to 20 feet in front of Hunter. On the day of the incident, Hunter did not specify the position of Cole's hands as he emerged from the brush. Four years later, however, Hunter recalled that Cole's hands were

---

[5] These sources are interpreted by two experts retained by the Coles, a forensic expert and a former police officer; their affidavits were submitted to the district court as attachments to the Coles' First Amended Complaint.

[6] The Coles' expert witnesses reviewed the recording from Hunter's body microphone and reported no warning before the shots commenced.

[7] The two experts also reviewed a second recording from another officer's body microphone (they hypothesized it was Cassidy's or Carson's) and reported the beginning of the word "drop" was spoken either after the initial volley of shots were taken or immediately preceding the gunfire—this word was not spoken by Hunter. The Coles' expert witness listened to an audio recording of the incident captured on Hunter's motorcycle unit and heard no verbal warning.

5

lowered, with the handgun in his right hand held no higher than waist-level. Cassidy, on the other hand, testified that Cole emerged with the handgun held to his head. Carson stated only that he saw Cole emerge from the tree line in front of Hunter, and that he "could not see what the suspect was doing before the shots were fired."

According to Carson, Hunter then gave Cole a command "about showing his hands or dropping his gun." Cassidy also testified that Hunter issued a command. In his initial statement Cassidy testified that high winds prevented him from hearing Hunter's words. Four years later, however, Cassidy could recollect that Hunter had shouted "[D]rop it!" Hunter himself equivocated on whether he shouted to Cole. Initially, Hunter stated that he had no chance to issue a command. Three days later, Hunter could no longer recollect whether he had or had not yelled to Cole. In a deposition four years after the incident, Hunter did not disagree with his fellow officers' recollection that he had issued a command.

Hunter and Cassidy testified that Cole turned and pointed his handgun at Hunter.[8] Hunter fired four rounds at Cole. Cassidy fired three. None of the officers recalled Cole discharging his own gun.

Eyewitnesses offer additional accounts. One witness, William Mackey, standing in a parking lot across the highway, heard one of the officers yell for Cole "to come out." Mackey recalled that when Cole emerged from the trees "roughly five officers" were on the scene, and more than one yelled for Cole to "drop his gun" before the shooting commenced. Mackey also remembered—in a second affidavit, sworn three years later—that Cole had "raise[d] his hand and point[ed] [an] object towards the officers." Another witness, Trent

---

[8] Carson testified he could not see Cole's movement because Cassidy and Hunter obstructed his line of sight.

Kornegay, saw Hunter drop to a knee looking into the trees; as Cole emerged, someone said "drop the gun," then shots were fired. A third witness, Steve Ellis, also across the highway, saw Cole emerge, then heard officers yell "repeatedly" for Cole "to drop the weapon and stop" before the shooting commenced. A fourth eyewitness standing in the same parking lot, Jim Owens, testified that Cole's hands remained motionless by his sides during the whole incident, and that no words were spoken or shouted before shots were fired.

Of the officers' shots, two hit Cole. One round fired by Hunter passed through Cole's left arm, into his torso, fracturing a rib, bruising his lung, and lodging in his back. A second round, also fired by Hunter, grazed his left arm. None of Cassidy's shots struck Cole. A third round entered three inches above Cole's ear from Cole's right, with fragments of the bullet exiting the top of his skull. The entry wound exhibited stippling, that is, discoloration of the skin caused by hot gases and residue released immediately around a discharging firearm. Ballistics analysis indicated that the trajectory of the third round was characteristic of a self-inflicted wound. When copper fragments were recovered from Cole's head, ballistics experts determined they had originated from Cole's handgun.

The Coles allege that while Cole was unconscious, bleeding "profusely" and "presumably . . . to death," the officers did nothing to help him. When paramedics arrived, Cole experienced cardiac arrest, but was resuscitated. He was then immediately taken to Baylor Hospital in Garland, where he was stabilized. Cole remained hospitalized, recovering from his injuries for months. He survived the shooting, but continues to suffer from serious mental and physical disabilities arising from his injuries.

Following the shooting, the three officers remained together at the scene, but never offered Cole assistance. The Coles allege that during this time the

officers conferred, and agreed to fabricate a story that would insulate Cassidy and Hunter from liability. Eventually, members of the Garland Police Department arrived and took control of the scene, but did not follow the standard procedure of separating witnesses to ensure independent recollections. Instead, members of the Sachse Police Department were allowed to escort Cassidy and Hunter back to their police station. The officers later provided statements to Garland Police Department investigators at the Garland police station. Based on the officers' statements, Cole was charged with the misdemeanor of unlawful carrying of a firearm[9] and the felony of aggravated assault of a public servant.[10] As a result of the assault charge, Cole, incapacitated in intensive care, was placed under house arrest. The Coles incurred substantial legal fees in connection with the charge. Around two years later, Cole received deferred adjudication on the unlawful carrying misdemeanor charge and the District Attorney dismissed the assault charge.

The Coles brought suit against Carson, Cassidy, and Hunter in the Eastern District of Texas.[11] The officers successfully transferred the case to the Northern District of Texas. The Coles' amended complaint brings three claims relevant here. First, the Coles bring a Section 1983 claim against Cassidy and Hunter, alleging a violation of Cole's Fourth Amendment right against the use of excessive force. Second, they bring a Section 1983 claim against all three

---

[9] Under Texas Penal Code Chapter 46, it is a Class A misdemeanor to "intentionally, knowingly, or recklessly carr[y] on or about [one's] person a handgun" unless on one's premises or inside or en route to one's motor vehicle or watercraft. TEX. PENAL CODE § 46.02. It is lawful for a handgun permit holder to carry a concealed handgun, and, as of January 2016, for a permit holder to openly carry a handgun that is holstered. *Id.* at § 46.035.

[10] Under Texas Penal Code Chapter 22, it is a first-degree felony offense to commit an assault on a public servant while the public servant is discharging an official duty. *Id.* § 22.02(b)(2)(B).

[11] The Coles also named the City of Sachse as a defendant.

officers alleging a violation of Cole's Fourth Amendment right against unreasonable seizures arising from the fabrication of evidence. Third, they bring a Section 1983 claim against all three officers alleging a violation of Cole's Fourteenth Amendment due process rights arising from the same fabrication of evidence.

The officers moved to dismiss these claims, asserting absolute and qualified immunity defenses. In a January 24, 2014 Memorandum Opinion and Order, the district court denied the officers' motion. Carson alone appealed the denial of the motion in connection with the Coles' Fourth and Fourteenth Amendment claims. The district court stayed the fabrication of evidence claim as to Cassidy and Hunter pending Carson's appeal. The district court allowed limited discovery focused on Cassidy and Hunter's qualified immunity defenses to the Fourth Amendment excessive force claim. Those two officers moved for summary judgment on the Fourth Amendment excessive force claim, again asserting qualified immunity. The district court denied the motion and Cassidy and Hunter appealed.

We consolidated Cassidy and Hunter's appeal of the denial of summary judgment with Carson's appeal of the denial of the motion to dismiss. On September 25, 2015, we affirmed the district court's denial of summary judgment based on qualified immunity with respect to the Coles' Fourth Amendment excessive force claim against Cassidy and Hunter, and affirmed the district court's denial of the motion to dismiss with respect to the Coles' Fourteenth Amendment due process claim against Carson. With respect to the denial of Carson's motion to dismiss the Fourth Amendment fabrication of evidence claim, we reversed.

The officers filed a motion for rehearing and en banc review in this court, which we denied. They then petitioned the Supreme Court for a writ of

certiorari. On November 28, 2016, the Supreme Court granted certiorari, vacated this court's judgment, and remanded the case for further consideration in light of *Mullenix v. Luna*,[12] decided in the intervening time. On remand, we called for supplemental briefing and oral argument. The parties' supplemental briefing is complete. We have heard oral argument.

## II

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[13] "Qualified immunity balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[14] Qualified immunity involves not only immunity from liability, but also immunity from suit.[15] The qualified immunity inquiry includes two parts. In the first we ask whether the officer's conduct has violated a federal right; in the second we ask whether the right in question was "clearly established" at the time of the violation, such that the officer was on notice of the unlawfulness of his or her conduct.[16] The officer is entitled to qualified immunity if there is no violation, or if the conduct did not violate law clearly established at the time.[17]

---

[12] 136 S. Ct. 305 (2015).

[13] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[14] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[15] *Id.*

[16] *Tolan v. Cotton*, 134 S. Ct. 1861, 1865–66 (2014).

[17] *Id.*

In the first part of our review we turned to the claim of a constitutional violation for each assertion of the qualified immunity defense. We first held that a reasonable jury could find Hunter and Cassidy violated Cole's Fourth Amendment right against the use of excessive force, and held that this conduct violated clearly established law.[18] Regarding Carson's motion to dismiss, we held that the Coles failed to allege facts sufficient to make out a Fourth Amendment violation in connection with fabrication of evidence,[19] but that their allegations were sufficient to sustain the Fourteenth Amendment due process claim.[20] In connection with the latter claim, we also held that the alleged violation violated clearly established law.[21]

We will not revisit the first part of the qualified immunity inquiry in connection with any of the Coles' claims, nor the question of clearly established law as regards the Coles' Fourteenth Amendment claim against Carson. We hear this case on remand from the Court for further consideration in light of *Mullenix*.[22] In *Mullenix*, the Court reversed a decision of this court in which we had found that a police officer violated clearly established law by shooting a fugitive during a car chase. In its decision the *Mullenix* Court addressed only the second part of the qualified-immunity inquiry: whether the officer's alleged conduct violated clearly established law.[23] The Court's mandate here reaches only this second part of the qualified immunity inquiry in connection with the

---

[18] *Cole*, 802 F.3d at 757–62.

[19] *Id.* at 764–65.

[20] *Id.* at 765–74.

[21] *Id.* at 773–74.

[22] *Mullenix v. Luna*, 136 S. Ct. 305 (2015).

[23] *Id.* at 308–12; *see also Aldaba v. Pickens*, 844 F.3d 870, 872 (10th Cir. 2016).

Coles' Fourth Amendment claim against Cassidy and Hunter, and, as we need not, we do not reach issues unaddressed by the mandate on remand.[24] We reinstate our prior decision as concerns all other parts of the appeal and address only the existence of clearly established law as it informs the denial of Cassidy and Hunter's motion for summary judgment.

Turning to that denial, we note that the district court did not weigh the evidence and resolve the factual disputes over the shooting of October 25, 2010, properly so.[25] Rather it asked only whether a jury should "resolve the parties' differing versions of the truth at trial."[26] The district court determined that genuine disputes of fact remained, that these disputes were material,[27] and should be resolved by a jury.

Our inquiry is more circumscribed. "An order denying a motion for summary judgment is generally not a final decision within the meaning of § 1291 and is thus generally not immediately appealable."[28] However, a denial of summary judgment on the basis of qualified immunity is immediately appealable under the collateral order doctrine.[29] With such an appeal our review is confined to the materiality of factual disputes identified by the

---

[24] *United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (finding that, absent exceptional circumstances, the court generally addresses only issues within the scope of a mandate on remand). *But see Hill v. Black*, 920 F.2d 249, 250 (5th Cir. 1990), *modified on other grounds on denial of reh'g*, 932 F.2d 369 (5th Cir. 1991) (holding that the court has jurisdiction to reach issues unaddressed by the Supreme Court's mandate on remand).

[25] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[26] *Id.* (internal quotation marks omitted).

[27] *See* Fed R. Civ. P. 56(a).

[28] *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018 (2014).

[29] *Id.* at 2019 ("[P]retrial orders denying qualified immunity generally fall within the collateral order doctrine."); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

district court.[30] We ask whether, if all factual disputes are resolved in the plaintiffs' favor, Cassidy and Hunter are entitled to qualified immunity as a matter of law. If so, the officers are due summary judgment; if not, we affirm the district court.[31] We take facts in a light most favorable to the non-movants, the Coles, and draw all justifiable inferences in their favor.[32] We consider the circumstances leading up to the officers' conduct,[33] but confine our inquiry to those facts knowable to the officers at the time.[34] Within the limited scope of our inquiry, review is de novo.[35]

The facts as we take them establish that Cole posed no threat to the officers or anyone else at the time Cassidy and Hunter shot him. The officers' limited knowledge of Cole created no reasonable expectation of an immediate violent confrontation: Cole was a high school student distraught over a recent breakup; he had carried his guns to a friend's house; the friend was unable to persuade Cole to part with the handgun, and Cole warned him not to try to take it. Both officers knew that Cole had walked away from two police officers without violent confrontation. At no point did Cassidy or Hunter hear orders to establish a perimeter around Cole, to conceal themselves, or to take cover, nor were there calls for backup from SWAT teams or tactical units to handle the situation. While Cole possessed a handgun, he did nothing to threaten the officers. The officers understood that Cole was unaware of their presence, and

---

[30] *See Good v. Curtis*, 601 F.3d 393, 397–98 (5th Cir. 2010).

[31] *Id.*; *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir. 2000).

[32] *Tolan*, 134 S. Ct. at 1866.

[33] *Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016).

[34] *White v. Pauly*, 137 S. Ct. 548, 549–50 (2017) (per curiam) ("[T]he Court considers only the facts that were knowable to the defendant officers.").

[35] *Good*, 601 F.3d at 398.

Cassidy and Hunter took cover and remained silent so that Cole would remain unaware. When Cole backed out from the brush, he was facing away from the officers. Moreover, they could see that the handgun was pointed at Cole's head. The weapon was in this position as Cole turned counterclockwise, and remained trained there until he was shot. Hunter and Cassidy opened fire before Cole had turned to face them, and before he registered their presence. At no time did Cole pose, or reasonably appear to pose, an immediate threat to the officers or anyone other than himself.

The only question we answer is whether, given these facts, Cassidy and Hunter violated clearly established law. Here, we have the guidance the Court provided in *Mullenix*. In that case, the Court reviewed a denial of qualified immunity to an officer who had shot and killed a fugitive in a car chase. This court had decided that the officer violated the clearly established rule that deadly force was prohibited "against a fleeing felon who does not pose a *sufficient* threat of harm to the officer or others."[36] The officer in *Mullenix* reasonably perceived some threat of harm, but we had held the threat was not "sufficient." The Supreme Court reversed our decision. It found that the rule we articulated lacked a referent to define the "sufficiency" of threats.[37] Precedents provided a "hazy legal backdrop," at best.[38] Given these deficient sources, an officer could not reasonably derive an applicable rule to govern his or her conduct in the situation.[39] Finding that we had defined the applicable

---

[36] *Mullenix*, 136 S. Ct. at 308–09 (emphasis added and internal quotation marks omitted).

[37] *Id.* at 309 ("The general principle that deadly force requires a sufficient threat hardly settles th[e] matter.").

[38] *Id.* at 309–10.

[39] *Id.*

rule with too much "generality,"[40] the Court reversed our holding that the officer had violated clearly established law.[41]

It is significant that the Court's focus in *Mullenix* was upon generality. In some conceptual sense, a legal rule is necessarily general: it applies not only to the case in which it is articulated, but to all like cases. The *Mullenix* Court does not repudiate generality in this sense. Rather it repudiates a second variety of generality, one that does not reach all legal rules: generality as indeterminacy.[42] A rule that is general in that it is indeterminate cannot be "clearly established," because a reasonable officer attempting to interpret and apply that rule in particularized circumstances will face legal uncertainty. The officer cannot be on notice of the proper course of action. In this scenario, *Mullenix* tells us that the qualified immunity doctrine insulates the officer from liability.[43] On the other hand, a reasonable officer is capable of reasoning analogically from a determinate and categorical rule to conclude that given conduct is prohibited.[44] Such rules, once articulated, are clearly established law.

---

[40] *Id.* at 311 (describing "the Fifth Circuit's error" in "defin[ing] the qualified immunity inquiry at a high level of generality").

[41] *Id.* at 312.

[42] The duality of the concept of generality is reflected in the multiple connotations of that term in common usage. *See, e.g., General*, OXFORD ENGLISH DICTIONARY (online ed. 2018) (defining "general" both as "[i]ncluding . . . the parts of a specified whole, or the . . . things to which there is an implied reference; completely or approximately universal within implied limits; opposed to partial or particular," and as "[n]ot specifically limited or determined in application; relating or applicable to a whole class of objects, cases, or occasions" (emphasis omitted)).

[43] *See Mullenix*, 136 S. Ct. at 308 (requiring that the rule be applicable such that "the statutory or constitutional question [is] beyond debate" and that the rule clarify "the violative nature of particular conduct" "(internal quotation marks and emphasis omitted)).

[44] *See id.*

Here, a determinate and categorical rule applied to the facts facing Cassidy and Hunter: officers are prohibited from using deadly force against a suspect where the officers reasonably perceive no immediate threat. This no-threat rule was clearly established as early as 1985, when the Court articulated it in *Tennessee v. Garner*. In that case an officer shot a suspect in the absence of a reasonable perception of threat.[45] Analyzing the case, the *Garner* Court began by describing a widely applicable standard governing the constitutionality of seizures, balancing the intrusiveness of a seizure against government interests.[46] But it did not stop there. The Court also articulated a bright-line rule to govern the limit condition in which governmental officers face no threat from a suspect: "Where the suspect poses *no immediate threat* to the officer and *no threat to others*, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."[47] The rule is categorical and determinate. It is general in the first sense of the term, but not in the second sense of indeterminacy.

By October 25, 2010 the no-threat rule had been clearly established for twenty-five years, and had been applied many times in this circuit. For example, in an unpublished 2008 decision, *Graves v. Zachary*, this court denied an officer qualified immunity for shooting a suspect who posed no threat to the officers or others.[48] We stated that where a suspect posed no threat, "the violation of his constitutional rights would have been obvious even without a body of relevant case law . . . . Under general precedents such as *Garner*, [the

---

[45] 471 U.S. 1, 2 (1985).

[46] *Id.* at 8.

[47] *Id.* at 11.

[48] 277 F. App'x. 344, 349 (5th Cir. 2008) (unpublished).

officer] should have known that his use of force was excessive."[49] Similarly, in an unpublished 2010 decision, *Reyes v. Bridgewater*, this court denied qualified immunity to an officer who shot a suspect who was armed with a knife but made no threatening gestures or motions towards the officer.[50] We invoked the "core, established rule" from *Garner* that "deadly force may not be used where the suspect poses no immediate threat to the officer and no threat to others . . . . It violates the Fourth Amendment to use deadly force absent such a threat."[51]

Cassidy and Hunter paint with too broad a brush when they argue that the Supreme Court's holdings preclude finding clearly established law in *Garner*. The officers fail to distinguish between the application of *Garner*'s "sufficiency of threat" balancing inquiry and the bright-line no-threat rule also articulated in that case. Unquestionably, where facts establish that officers reasonably perceived some threat, *Garner* requires a balancing analysis to gauge the "sufficiency" of the threat relative to the use of force. *Mullenix*, and several other decisions of the Court, conclude that this balancing exercise standing alone is too indeterminate to present as clearly established law.[52] Rather, in these situations, "[p]recedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable

---

[49] *Id*. (internal quotation marks and citation omitted).

[50] *Reyes v. Bridgewater*, 362 F. App'x 403, 407–08 (5th Cir. 2010) (unpublished).

[51] *Id*. at 407 (internal quotation marks and citation omitted).

[52] *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004) (addressing application of *Garner*'s objective reasonableness standard); *Plumhoff*, 134 S. Ct. at 2023-24 (2014) (addressing application of *Garner*'s standard where suspect "indisputably posed a danger both to officers involved and to any civilians who happened to be nearby"); *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (addressing application of *Garner*'s reasonableness standard where police reasonably perceived a threat).

force and thereby provide an officer notice that a specific use of force is unlawful."[53]

There is, however, a threshold inquiry as to whether the facts sustain finding any reasonably perceived threat at all. In situations where they do not, the Court has not repudiated application of *Garner*. On the contrary, it has repeatedly explained that, in what it calls "obvious case[s]," *Garner* provides clearly established law.[54] This court has held similarly. In *Mason v. Lafayette City-Parish Consolidated Government*, a police officer fired upon a suspect while responding to a purported armed robbery.[55] The officer fired seven shots, the final two of which hit the suspect in the back while he lay incapacitated by previous shots.[56] When the officer invoked qualified immunity in response to a Section 1983 excessive force claim, we reversed the district court's grant of summary judgment on the basis of the defense.[57] Addressing clearly established law, we held that *Garner* provided the relevant "command that deadly force is unconstitutional when 'a suspect poses no immediate threat to the officer and no threat to others.'"[58] Similarly, we applied the no-threat rule

---

[53] *Kisela*, 138 S. Ct. at 1153 (internal quotation marks omitted); *see also Pauly*, 137 S. Ct. at 552; *Brosseau*, 543 U.S. at 201.

[54] *Brosseau*, 543 U.S. at 199 (observing that "in an obvious case" *Garner* "can 'clearly establish' the answer, even without a body of relevant case law"); *Pauly*, 137 S. Ct. at 552; *Kisela*, 138 S. Ct. at 1153.

[55] 806 F.3d 268 (2015). The police understood the situation to be an armed robbery based on a 911 call. *Id.* at 272.

[56] *Id.* at 273-74.

[57] *Id.* at 278.

[58] *Id.* (quoting *Garner*, 471 U.S. at 11).

in the unpublished *Giardina v. Lawrence* decision.[59] There, the facts taken in a light most favorable to the non-movant established that a national guardsman had shot a man who had been speaking with a 911 dispatcher on his cellphone.[60] We held that the defendant had violated the *Garner* no-threat rule: "[i]t is clearly established that it is unconstitutional for an officer to use deadly force where there is no threat of serious physical harm."[61]

We note in passing that, in dictum to an unpublished opinion last year, *Hatcher v. Bement*, this court characterized the *Garner* no-threat rule as a "general test,"[62] and reasoned that, under *Mullenix*, we "could not rely on th[e] general test detached from factual application."[63] Rather, we wrote, "this general test must be tethered to precedent containing facts analogous or near-analogous to the facts in the case under consideration . . . ."[64] *Hatcher*'s characterization of the no-threat rule as a "general" test is ambiguous given the term's multiple senses, as we explained. To the extent this dictum[65] from *Hatcher* suggests that we must identify a precedent mediating the application

---

[59] 354 F. App'x 914, 916 (5th Cir. 2009) (per curiam) (unpublished) (citing *Garner*, 471 U.S. at 10–12).

[60] *Id.*

[61] *Id.*

[62] 676 F. App'x 238, 243 (5th Cir. 2017) (per curiam) (unpublished).

[63] *Id.* (internal quotation marks omitted).

[64] *Id.* (internal quotation marks omitted).

[65] The characterization of *Garner*'s no-threat rule is dictum because the *Hatcher* court found that more recent circuit precedents provided the clearly established law governing its decision. *See Hatcher*, 676 F. App'x at 243-44; *see also Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it." (internal quotation marks omitted)).

of *Garner*'s no-threat rule to a case's no-threat facts, we disagree. The Supreme Court has stated precisely otherwise,[66] and no other binding authority requires such mediation by precedent where an existing legal rule is determinate and applicable, that is, where the rule is clearly established.

Cassidy and Hunter argue that, as of October 25, 2010, the precedential waters were muddied by several decisions of this court. These decisions were premised on findings that officers reasonably perceived a threat in situations similar to Cassidy and Hunter's encounter with Cole. Under *Mullenix*, a rule of clearly established law must be specifically applicable to the facts before the court,[67] and applicable law can arise from precedents.[68] The Court cautions, however, against reasoning analogically from cases meaningfully distinct on the facts.[69] We heed that warning. Whether Cassidy and Hunter reasonably perceived a threat when they fired upon Cole is a factual question. It is one that the district court found genuinely disputed. Our inquiry takes the facts in a light most favorable to the Coles, and in that light a factual premise of our analysis is that there was no reasonably perceived threat. The cases to which Cassidy and Hunter direct us are inapposite, because they are all premised on factual findings of a threat.[70] We cannot and will not revise the district court's identification of genuine fact disputes.

---

[66] *See supra* note 54.

[67] *Mullenix*, 136 S. Ct. at 308 (2015).

[68] *Id*. at 309.

[69] *Id*. at 312.

[70] *Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991) (holding that *Garner* did not prohibit conduct where facts indicated that an officer reasonably perceived a threat from a non-compliant suspect after a car chase); *Young v. City of Killeen*, 775 F.2d 1349, 1352–53 (5th Cir. 1985) (holding that there was no constitutional deprivation where "all witnesses agreed" that the officer had reasonably perceived a threat at the time of the shooting);

No. 14-10228 c/w 15-10045

Cassidy and Hunter are not entitled to qualified immunity at this point in the case.

### III

Immunity from trial is an important component of qualified immunity, but denial at this stage does not necessarily deprive the officers of the immunity defense as to liability. We decide only that it will be for a jury to resolve what happened on October 25, 2010, and whether Cassidy and Hunter are or are not entitled to the defense. For our purposes, the district court determined there was a genuine factual dispute. We hold this dispute is material. We AFFIRM the denial of Cassidy and Hunter's motion for summary judgment, otherwise REINSTATE our previous opinion in this case, and REMAND for further proceedings consistent with this opinion.

---

*Ontiveros v. City of Rosenberg*, 564 F.3d 379, 385 (5th Cir. 2009) (affirming summary judgment on the basis of qualified immunity where facts indicated that a SWAT team officer reasonably perceived a threat from a non-compliant suspect barricaded behind a door); *Manis v. Lawson*, 585 F.3d 839, 845–46 (5th Cir. 2009) (holding that an officer was entitled to qualified immunity where facts established that he reasonably perceived a threat from a non-compliant suspect refusing to show his hands and appearing to retrieve a gun); *Ballard v. Burton*, 444 F.3d 391, 402–03 (5th Cir. 2006) (holding that an officer was entitled to summary judgment on an excessive force claim where facts indicated the officer reasonably perceived a threat from a non-compliant suspect); *Ramirez v. Knoulton*, 542 F.3d 124, 129–31 (5th Cir. 2008) (holding that an officer was entitled to qualified immunity where facts indicated that a suspect was "defiant and threatening"). *See also Salazar-Limon v. City of Houston*, 826 F.3d 272, 279 (5th Cir. 2016) (holding that an officer was entitled to qualified immunity where the officer reasonably perceived a threat from a non-compliant suspect who physically struggled with the officer before suddenly reaching towards his waistband).